## MONROE COUNTY *v.* WILLIAM B. STRONG ET AL.[*]

1. BOARD OF SUPERVISORS. *Courts.*

   The courts will not interfere with a board of supervisors in the exercise of the jurisdiction committed to it by law on the sole ground that its action is unwise or not conducive to public interest.

2. SAME. *Extraordinary expenditures. History of legislation, constitutional and statutory. Constitution* 1869, *art.* 6, *sec.* 20. *Ib., art.* 12, *sec.* 16. *Constitution* 1890, *sec.* 80. *Ib., sec.* 170. *Code* 1892, § 322. *Ib.,* §§ 311, 312, 313.

   A board of supervisors, without proceedings under code 1892, §§ 311, 312, and 313, providing for the issuance of bonds and loan warrants, cannot lawfully contract for an extraordinary expenditure, if the contract will inevitably create a debt which, added to the necessary current expenses of the county, will largely exceed all possible revenues on the basis of a maximum levy of taxes.

[*]Judge Calhoon, having been of counsel in this case, took no part in its decision. C. H. Alexander, Esq , was commissioned and acted as special judge in his place.

3. Appeal.  *Board of supervisors.  Code* 1892, § 79.

> The appeal provided by code 1892, § 79, from the board of supervisors to the circuit court,. can be prosecuted without bond.

From the circuit court of Monroe county.

Hon. Eugene O. Sykes, Judge.

The opinion states the facts.

*Calhoon & Green* and *Green & Green,* for appellant.

The constitutions of 1832 (art. 4, sec. 20), 1869 (art. 6, sec. 20) and 1890 (sec. 170), give the board of supervisors full jurisdiction over roads, ferries and bridges.  This case is settled in its material features by the decisions in the cases of *Rotenberry* v. *Yalobusha County,* 67 Miss., 470; *Bank* v. *Duncan* (defining "full jurisdiction"), 52 Miss., 745; *Warren County* v. *Klein,* 51 Miss., 807, and *Gamble* v. *Witty,* 55 Miss., 34.  See code 1892, §§ 3937, 3938, and *Dixon* v. *Greene County,* 67 Miss., 794.

*Walker & Tubb,* on same side.

Congress, by act of July 7, 1898, having authorized the construction of the bridge over the Tombigbee river (an interstate stream), the supervisors needed (in fact already had by the state constitution itself) no further authorization from the state.  *Cardwell's case,* 113 U. S., 205; *Lake, etc., R. R. Co.* v. *Ohio,* 165 U. S., 365; *Escanaba Co.* v. *Chicago,* 107 U. S., 678; *Pound* v. *Turck,* 95 U. S., 459; *Gilman* v. *Philadelphia,* 3 Wal., 713.

That the board had the power to adjudge the building of the bridge a necessity cannot be disputed.  Constitution 1890, sec. 170; code 1892, § 289; *Board* v. *Arrighi,* 54 Miss., 668; *Paxton* v. *Baum,* 59 Miss., 531; *Rotenberry* v. *Yalobusha County,* 67 Miss., 470.  The "regulations prescribed by the legislature" for the government of the board in the exercise of its "full jurisdiction" are found in code 1892, §§ 340, 341, 342 and 3937.  These sections do not support the judgment ap-

pealed from.    Code 1892, §§ 311, 312 and 313, have no appli-
cation, as we submit, to the case.

*Critz, Beckett & Kimbrough,* on same side.

Code 1892, §§ 311, 312 and 313, were intended to enlarge
and not to restrict the powers of the board of supervisors; be-
sides § 313 is local, applies only to counties having more than
30,000 inhabitants, when the necessity of a bridge in such coun-
ties may not be greater than in those of a lesser number of in-
habitants.    Unless these sections are perverted from their true
purpose, an enlargement of the powers of the board, they can-
not be made to do service for the appellees in this case.

*Houston & Houston, Bristow & Sykes, Gilleylen & Left-
wich, George C. Paine* and *D. W. Houston,* for appellees.

1.  In the absence of authority from the legislature of the state
the board of supervisors of a county has no authority to ob-
struct, by a drawbridge, with a central pier, a navigable river,
like the Tombigbee, navigable both above and below the pro-
posed bridge site, running through several counties of the state,
thence into Alabama and thence into the Gulf of Mexico.
Constitution 1890, sec. 81; *Commonwealth* v. *Charleston,* 1
Pick. (Mass.), 180, s.c. 11 Am. Dec. 161; *Commissioners* v.
*Withers,* 29 Miss., 21; 4 Am. & Eng. Enc. Law (2d ed.), 923,
and authorities cited; *Bailey* v. *Philadelphia, etc., Ry. Co.,*
44 Am. Dec., 593; *Attorney-general* v. *Stevens,* 22 Am. Dec.,
526; *Dwyer* v. *Tuscaloosa,* 2 Porter (Ala.), 296; *Wisconsin* v.
*Mouson,* 51 Wis., 255; *Fort Plain, etc., Co.* v. *Smith,* 30
N. Y., 63.

2.  Under the constitution and laws of the state of Missis-
sippi the boards of supervisors have no jurisdiction over the
construction of drawbridges of this character. *Penn* v.
*Wheeling Bridge Co.,* 18 How. (U. S.), 518; *Allen* v. *Union
Packet Co.,* 21 Wall. (U. S.), 395; *Lake Shore, etc., R. R.
Co.* v. *Ohio,* 165 U. S., 363; *Cardwell* v. *American, etc., Co.,*
113 U. S., 205.

3. For the construction of public works of the character and magnitude of this steel drawbridge, in the absence of ready money in the county treasury to pay for the same, the provisions of §§ 311, 312 and 313, code of 1892, are ample, proper and exclusive.

4. On general principles boards of supervisors, with their limited jurisdiction under the laws, have no authority to make appropriations of this character, without recurring to the legitimate source of all authority, the people, under statutory provisions made expressly therefor.

5. The jurisdiction of boards of supervisors over roads, ferries, and bridges, under the constitution of Mississippi, is not unlimited; it can only be exercised when and in the precise manner the legislature may prescribe, and there are no legislative regulations in this state warranting the contract annulled by the circuit court.

6. The levy of a tax sufficient to pay for this bridge and its approaches, in connection with the absolutely necessary expenses to keep the county from bankruptcy and anarchy, will be compelled to exceed the limit prescribed by the legislature for state and county taxation, and, therefore, to carry out this contract, a debt against the county is necessarily incurred.

7. Extraordinary expenditure, like that for the building of this steel drawbridge over a navigable stream, useless to nine-tenths, of the people of the county, and at a point where there is already a free ferry, and where the river is fordable eight months in the year, will not, in the apportioning of a limited amount of money collected by taxation, be preferred to the necessary and ordinary expenses of the county, the courthouses, jails, paupers, county officers, etc., but will be subordinate to these necessary and ordinary expenses.

8. Even if the expenditures, including said bridge and approaches, should not exceed the limit of legal taxation, still, on general principles, the board of supervisors are not authorized to appropriate large sums of money like this for extraor-

dinary purposes, of their own will, when there are express provisions for a referendum to the taxpayers.

9. The official bonds of $2,000 required from the members of the board of supervisors, as a security for any illegal act of such member, and there being a majority able to pass any illegal measure, $6,000 is the limit of the board's jurisdiction to appropriate money in the ordinary way. Over that sum a referendum to the people is provided in §§ 311, 312, and 313, code 1892.

10. The laws of Mississippi for all public expenditures require contracts to be made for and paid in cash, whereas it is admitted by the record in this cause that for a portion, if not all the two appropriations, $15,775 and $920, in this case, an indebtedness will be incurred against the county, and thus the county will not be on a cash basis, as required by law.

Argued orally by *M. Green* and *Monroe McClurg*, attorney-general, for appellant, and by *D. W. Houston*, for appellees.

Alexander, Special J., delivered the opinion of the court.

The board of supervisors of Monroe county, at its regular meeting in October, 1898, passed an order for the construction of a steel drawbridge across the Tombigbee river, a navigable stream which intersects the county. Due advertisement was made for bids, with the result that the contract was awarded to the Southern Bridge Company, of Birmingham, Ala., for the sum of $15,775, one-half to be paid on completion of the bridge and the other half one year thereafter. This action of the board was taken in response to a petition of taxpayers requesting that the bridge be built. On the other hand, it met with active and determined opposition from other taxpayers, who appeared before the board in person and by attorneys and protested against the building of the bridge and against the making of this contract. The objections of these contesting taxpayers were overruled, and from the order of the board ac-

cepting the bid of the Southern Bridge Company and awarding the contract an appeal was taken to the circuit court. This appeal resulted in a judgment in the circuit court reversing the order of the board of supervisors. Thereupon the board re-advertised for bids upon the same plans and specifications, but changed the terms of payment, and provided that the entire contract price should be paid in a common county warrant or warrants, to be issued at the first regular meeting of the board after the completion and acceptance of the bridge, which, by the terms of the contract, was to be completed on or before December 1, 1899. The contesting taxpayers again appealed to the circuit court and a second time secured judgment reversing the order of the board, and from this judgment the county prosecutes this appeal. At the August term, 1899, a contract was also entered into by the board in like manner, and after like protest, with one L. D. Booth to build the approaches to the bridge for $920, to be paid upon completion. The same contestants appealed from the order evidencing this contract, and the two causes were consolidated in the circuit court.

Several of the objections set out in the protest of the tax-payers relate to the expediency of the proposed action of the board, and much evidence was introduced for the purpose of showing that the bridge was not a public necessity, and was not demanded by any consideration of the public interests. These objections cannot be considered. Courts will not inter-fere with boards of supervisors in the lawful exercise of the jurisdiction committed to them by law on the sole ground that their actions are characterized by lack of wisdom or sound discretion. *Rotenberry* v. *Yalobusha Co.*, 67 Miss., 470, s. c. 7 South., 211.

We do not deem it necessary to pass upon all the grounds set out in the protest against the action of the board. Some of them are trivial, and in any view of the case, would not call for notice. We pass to the consideration of the objection prominent in the argument of the case on both sides, and which

must control our decision.   This objection is that the amount
which, under this contract, was to be paid for the bridge, when
added to the county's ordinary expenses, incurred, and abso-
lutely necessary to be incurred, during the current year, would
largely exceed the revenues of the county from all sources,
even although the maximum levy of taxes be imposed.   The
argument for appellee is that a steel drawbridge necessarily
calls for an extraordinary expenditure of county funds, and
that, where the money to pay therefor and to pay the absolutely
necessary current expense of the county cannot be raised by a
levy of taxes within legal limits, and these facts are brought to
the knowledge of the board before the contract is entered into,
it can make the contract only as authorized by §§ 311-
313, code 1892.   The question thus presented is one vitally
affecting the public interests, and its solution is not free from
difficulty.   So far as the objections thus presented rest upon
the evidence in the case, it is fully supported.   This evidence,
adduced before the board, and now before us, establishes be-
yond question that the performance of the proposed contract
by the county according to its terms, that is to say, by pay-
ment in cash of the contract price of the bridge and its ap-
proaches on or before December 1, 1899, if not an impossibil-
ity, was certainly not within any reasonable expectation on the
part of any member of the board.   At the time the order was
entered, namely, at the May term, 1899, there was no out-
standing bonded indebtedness of the county, and therefore, un-
der the revenue act of 1898, the levy for county taxes, together
with the state tax, could not exceed 15 mills.   The state tax
being 6½ mills, the maximum limit of county taxes was 8½ mills.
It was quite clearly shown by the testimony of the president
of the board of supervisors and the chancery clerk, viewed
in connection with the assessment rolls, and the various official
records illustrating the financial condition of the county,
that a maximum levy for taxes would inevitably fall short, by
several thousand dollars, of raising sufficient funds to meet

the warrants already outstanding drawn against the current revenues, and to meet the absolutely necessary current expenses of the county, and to pay the warrant to be issued for the bridge. The orders were passed over the protest of two members of the board, and after propositions for raising the necessary funds by the issuance of loan warrants or bonds had been rejected. The members of the board themselves, by contracting in the first instance for the payment of only one-half of the price upon the completion of the bridge, seemed to recognize that full payment at that time would be impracticable, if not impossible. The three members who composed the majority recorded as their only reason for voting against the propositions submitted by the minority, that they were opposed to the issuance of bonds "in these times of peace," a reason which carries the fair implication that if Monroe county had been in a state of war, they would have voted for the bonds as a military necessity.

The law in the light of which this case must be decided cannot be ascertained by a view of any statute taken alone, but must be found by an examination of all the constitutional and statutory legislation touching the jurisdiction and powers of the board of supervisors and the administration of county finances. The constitution of 1869, article 6, sec. 20, conferred on boards of supervisors "full jurisdiction over roads, ferries and bridges," and by section 16, article 12, provided that "no county shall be denied the right to raise by special tax money sufficient to pay for the building and repairing of courthouses, jails, bridges and other necessary conveniences for the people of the county." The code of 1857 expressly exempted taxation for these purposes from the general limitation imposed upon county taxation. But the code of 1871, and all the subsequent revenue acts other than the code of 1880, omitted this exception, and extended limitations upon the taxing power to taxation for all purposes. In *Board* v. *Klein*, 51 Miss., 807, and *Gamble* v. *Witty*, 55 Miss., 26, these leg-

islative limitations were held unconstitutional in so far as they attempted to limit boards of supervisors in their power to tax for the specific purposes above enumerated. These cases were, however, overruled in *Beck* v. *Allen*, 58 Miss., 143, which settled, though by a divided court, that the constitutional grant of full jurisdiction in these matters was subject to legislative control and regulation. This judicial construction of the law was crystallized into express enactment in the constitution of 1890, which, in section 170, granted to boards of supervisors full jurisdiction over roads, ferries and bridges, but "to be exercised in accordance with such regulations as the legislature may prescribe." Section 16, article 12, was not brought forward into the new constitution. This and other provisions of the constitution of 1890, as well as the statutes subsequently enacted, manifest a purpose to more closely limit and fetter boards of supervisors, and also municipal authorities, in the matter of taxation. Whatever degree of trust and confidence may formerly have been reposed in these local boards, such spirit is not observable in present constitutional and statutory provisions. It may be that the experience of taxpayers in this state during an era historic for its shameless extravagance and robbery under the guise of taxation has not been without its lessons to our people. However this may be, the constitution of 1890 introduced several new safeguards for the taxpayers. Section 80 enjoins upon the legislature to make provision by general laws to prevent the abuse by cities, towns and other municipal corporations of their powers of assessment, taxation, borrowing money and contracting debts. Section 183 prohibits counties and municipalities from loaning their credit in aid of corporations. Section 176 makes ownership of real estate a qualification for the office of supervisor, the evident purpose being to exact a guaranty that every incumbent of this extremely important office shall be identified in interest with the taxpayers of his county.

Following the injunction of the constitution, the legislature,

in the municipal chapter of the code of 1892, has limited the power of municipal authorities to contract debts, and made any increase of municipal indebtedness or municipal taxation, unless authorized by a vote of the people, an offense calling for removal from office and ineligibility to re-election.    When we turn to the legislation in the code of 1892 touching the powers of the boards of supervisors and their control over county finances, we find that important changes in the law have been introduced.    Section 1382, code 1871, made it unlawful for a board of supervisors to allow any greater sum for any account or demand against the county than the amount actually due thereon, dollar for dollar, according to the legal or ordinary compensation for such services rendered, or for salaries, or for fees of officers, or for materials furnished.    In *Board* v. *Klein*, *supra*, this section was construed not to prohibit contracts and allowances on the basis of credit prices.    The section, though brought forward without change in the code of 1880, appears in § 322 of the code of 1892 with a radical change in its provisions.    It inserts the word "cash" before the word "compensation," and thus for the first time declared it unlawful for the board to make allowances on any other than a cash basis.    We must assume that this change was made to cure what was considered an evil in the former statute as it had been construed.    But the counties were not left without provision for emergencies, for by § 313, code 1892, ample provision is made for temporary loans to defray current expenses by means of loan warrants issued against taxes of the year, and by § 311 power is given the board to provide for extraordinary expenditures for necessary county conveniences by the issuance of bonds.    The only prerequisites for the issuance of loan warrants or bonds are notice to the taxpayers and an opportunity by petition to secure a vote to decide upon the proposed expenditure.

We are of the opinion, from a consideration of all these statutes, that they manifest an intention not only to limit the

power of the board to levy taxes, but, by necessary implication, impose a limitation on the power to contract debts. The scheme of county finances is annual in its nature. A fiscal year is prescribed, and annual statements as to the finances and annual settlements are required. This is implied in the statute, which is at once the source and limitation of the power of the board to impose taxes. "They shall have power to levy such taxes as may be necessary to meet the demands of their respective counties." This levy is annual, and the board must look alone to such persons and property as are subject to state taxes for the "time being," and the levy must be within "the limits that may be prescribed by law." The law contemplates that the board ought neither to accumulate a surplus, to tempt to extravagance, nor permit a deficit, to embarrass the county in succeeding years.

This fiscal system presupposes that boards of supervisors may, within reasonable limits and in good faith, anticipate the revenues of each current year. Such right has been recognized even in those jurisdictions where there are express prohibitions against the creation of debts by counties or municipalities. It must not be forgotten that taxes are a lien from the first day of February of the year in which they are levied, and warrants drawn against revenues already secured by such a lien can hardly be viewed in the same light as permanent debts of the county. But, while some latitude must be allowed to boards of supervisors in their estimates as to probable receipts and expenses, we are not prepared to concede to them the right knowingly and intentionally to make contracts which create large debts to be provided for in subsequent years, probably by their successors and in ways not possible at the time for them to foresee. In almost every system of county or municipal finances there must be some distinction between current and absolutely necessary expenses and extraordinary expenses for exceptional purposes. This distinction finds recognition in our our statutes. Section 318, code of 1892, which provides for

priority in the payment of county warrants in the order of registration, expressly excepts jury and witness certificates. Section 313, giving to boards of supervisors the right to borrow upon loan warrants, excepts warrants to pay judiciary expenses. These sections manifest a purpose not only that payment of warrants for such expenses shall not be postponed, but that no special tax shall be resorted to for their payment. If the board of supervisors, under the general law, has power to contract debts without limit, then § 311 of the code presents a singular anomaly. It will result that the board, though acting under the sanction of a popular vote, can issue bonds only to a limited amount, whereas the board, acting independently of the taxpayers, and even against their wishes, can contract debts and issue warrants payable immediately and without limit as to the amount. Thus the board is greater than the board plus the people. This, indeed, is to place the servant above his lord.

It is said in behalf of appellant that § 318, providing for registry of warrants, and their payment in the order of their registration, is a recognition of the general right of the board to first create a debt and afterwards provide the means for its payment. But this section is entirely consistent with an annual scheme of county finances, and the consequent right, within reasonable limits, to anticipate the current yearly revenues. All taxation presupposes debts or obligations. The initial step in taxation is the creation of a debt. If the debt be not unlawful, the faith of the county must stand pledged to its ultimate payment, and the payment must come from taxation. Power in boards of supervisors to contract debts binding on the county to an unlimited amount can hardly consist with statutes limiting the amount of county taxation, and prohibiting, under severe penalty, contracts on any other than a cash basis. If the board of supervisors in this case could lawfully contract a debt for $16,000, why could it not with equal right contract a debt for $100,000? And in that case it only would be necessary for

the holder of the warrant to have it registered in order to pre-empt (except as against judiciary expenses) the entire revenues of the county for a term of years.   We shrink from any con-struction of our legislation which will impute an intent to give to boards of supervisors so dangerous a power.   The question now before us is not whether a board of supervisors can lawfully issue a warrant when the funds to pay it are not already in the county treasury.   It is not whether contracts made or war-rants issued by the board in good faith, and not for the pur-pose of creating a debt, but with a reasonable expectation of payment from current revenues, are void, even although they may aggregate more than such revenues can pay.   It is not whether allowances on which warrants have been issued are void on collateral attack for any of the objections herein men-tioned.   We confine our decision to the question fairly pre-sented by the facts of this case, and hold that a board of super-visors, without proceeding under §§ 311 or 313 of the code, cannot lawfully contract for an extraordinary expenditure—as in this case for a bridge over a navigable stream—where the order therefor is directly attacked, and it is shown that the contract will inevitably create a debt, which, added to the abso-lutely necessary current expenses, will be largely in excess of all possible revenues even on the basis of a maximum levy of taxes.   This view accords with that taken by the court below, and the judgment is

*Affirmed.*

After the delivery of the foregoing opinion a suggestion of error was presented by *Green & Green; Walker & Tubb; Critz, Beckett & Kimbrough,* and *Monroe McClurg,* attorney-general, for appellant; a reargument was had, and the following points were made by said counsel.

The opinion delivered in this case is erroneous in holding that the power to contract for building a bridge is limited by the power to levy annual taxes.   If such limitation exists, or

was intended, is it not strange that the legislature did not un- mistakably express its intention in plain language? Section 170, constitution 1890, confers on the board "full jurisdiction over roads, ferries and bridges, to be exercised in accordance with such regulations as the legislature may prescribe." This jurisdiction can be regulated by law, but it cannot be taken away. It belongs "exclusively" to the board. *Rotenberry* v. *Yalobusha County*, 67 Miss., 471.

In *Supervisors* v. *Arrighi*, 54 Miss., 672, it is said: "Juris- diction over roads, ferries and bridges is by the constitution conferred upon the boards of supervisors just as equity juris- diction is conferred upon the courts of chancery and appellate jurisdiction upon this court. It is not within the power of the legislature to take away these several jurisdictions or bestow them upon other tribunals; but by virtue of its possession of the general legislative authority of the state, it may prescribe the mode and manner in which these several jurisdictions shall be exercised, and the regulations prescribed will be obligatory, unless they amount practically to a deprivation of power." The constitution 1890, sec. 170, supra, substantially ordains this interpretation of the constitution of 1869, and hence the organic law has been constant.

To make the power depend upon a condition dehors the con- trol of the board, as an election, is to deprive the board of the power. The constitution requires an absolute power in the board, the opinion denies any unlimited power. To regulate means to provide for the manner or mode of the exercise of the power, it preserves the power itself unimpaired. The opinion confounds two essentially different things, viz.: the power of the legislature to regulate taxation so as not to exceed a sum certain each year, and the power to limit "full" power of the board to contract for bridges. The former power is vested in the legislature under its general power to control state and county taxation. The latter is a power without limitation, that is, restriction, derived from the constitution and beyond legis-

lative impairment. That such a confounding exists is illustrated by the reliance upon *Beck* v. *Allen*, 58 Miss., 143. That case involves only the question of the taxing power. It does not even remotely involve the construction of the "full jurisdiction" over the erection of bridges and contracts therefor.

If the legislature can restrict in part, it can restrict in whole. If it can deny the full power to build a bridge costing one sum, it also has power to deny it for any other sum. If the capacity of the board is to be reduced from full in any degree, it can be wholly destroyed. What avails the declaration of the power if the legislature can destroy its exercise?

The power to contract is denied because the capacity to pay during the year is limited. This, it is respectfully submitted, is fallacious. The power to contract—that is, provide for the public convenience by erection of bridges—is one power; the power to raise the funds to pay for them is quite an independent power. This contention is borne out by the statutes on the subject. Code 1892, § 289; *Ib.*, § 3937.

It is also erroneous to hold that the limitation on the power to contract exists, because, under § 311, the board has power, under a vote, to issue bonds, or loan warrants under § 313. Sections 311 and 313 are permissive; it "may issue bonds," or "may borrow money." This is a power conferred to be used in the discretion of the board if it deems a bond issue better than to finance from county funds. It presupposes power to pay from other sources. Is it possible that the mandatory "shall contract," of § 3937, is made permissive by the favorable action or not of the people at an election under § 312?

The fiscal affairs of the county as to its debts are not annual, as declared. A debt of one year can be allowed and paid by a warrant of a succeeding year. There is no requirement that the debts of a year shall be allowed and paid during that year. No statute of limitations until presentment and refusal of payment runs on a claim against the county.

Section 320, code, provides that all claims shall be allowed in term time, and this whensoever created. When allowed, warrants are issued therefor, and these warrants are not payable in any year, unless registered, and, then, if not presented within one year after date of registration, it merely loses its priority of registration. Section 318. It is true § 314 makes the levy of taxes annual, necessarily so, otherwise there would be no certainty in the collection of the taxes. But there is no provision which requires the levy of taxes to cover only warrants issued upon claims of that fiscal year.

We submit with all deference that the error of the theory of the opinion is demonstrated by the declaration that the rule announced is confined to the cases where there is a contest before the board, and that it does not extend to collateral attack by third parties. Recall the question being decided; it is whether this inferior court has jurisdiction to make a contract for bridges. The essential thing is jurisdiction or not. It can make no difference whether the attack is collateral or by appeal. If the jurisdiction did not exist, the contract would be void in either mode of attack. It is always difficult to separate the expediency of the grant of a power in determining the existence or not of the power itself.

Where there is full power conferred by the constitution to contract, with power in the legislature to regulate the exercise of this power, as expressly declared in Arrighi's case, supra, there is no legislative power to "impose a limitation on the power to contract debts." Nor could there be created under a power "to regulate" the exercise of the full jurisdiction, a limitation "by necessary implication." Repeals may be effected by "implication" because of the conflict between the former and later statutes, and only because of such irreconcilible conflict. Sedg. Const. & Stat. L., 123–129. But what is said to be done here is the opposite of repeal. It is to affirmatively enact a limitation on an express power "by necessary implication." By every rule of construction, repeals

by implication are to be avoided, if possible, and yet here the creation of a limitation upon an express power is held to arise by implication. That is, that the existing grant of "full" power is to be denied its full force by an "implication," something that does not actually exist, but must be supposed to exist. Can statutes depriving constitutional grants of their full scope be impliedly created?

Note this "implication" is the creature of the court. It finds place only in the mind of the court in its process of reasoning in order to bridge a chasm in the declarations of the constitution and statutes. Limit the power of the board! Arrighi's case says it cannot be done by the legislature. This constitutional grant can only be effected by a constitutional power. It cannot be impaired by statutes.

The original of code 1892, § 322, is found in the acts of 1870, page 83, section 10. It was enacted when county warrants were at a discount, and its purpose was to prevent the board from adding the discount to the claim and issuing a warrant for the total, and thereby making the county pay the discount on the warrants. *Klein* v. *Supervisors*, 51 Miss., 807. Section 322 changed the language of the act of 1870, and inserted, before compensation, the word "cash." The effect of this change was that the board shall not make the county pay the discount on its own warrants.

But § 322, code, cannot possibly affect the question here, for the reason that that section is confined exclusively to the issuance of a warrant, not to the making of a contract. The order on the minutes making the contract is the contract that binds the county. In bridge contracts these orders must be on the minutes, and when unreversed they bind the county. *Dixon* v. *Green County*, 76 Miss., 794. The warrant is but the execution of the allowance by the board in pursuance of this contract. *Supervisors* v. *Klein*, 51 Miss., 807; *Green* v. *State*, 53 Miss., 152.

---

The law forbade payment before completion of the contract according to the plans and specifications.   Code 1892, § 342.

The contract was made on an absolutely cash basis beyond all question.   There was, in fact, no element of a credit arrangement in this transaction.

But, above all, the question being jurisdictional, can, therefore, be raised at any time.   The circuit court had no jurisdiction of this case.   No appeal bond whatever was executed for carrying the case from the supervisors' court to the circuit court.

ALEXANDER, Sp. J., delivered the opinion of the court on reargument and in response to the suggestion of error.

The objection first made here on reargument that the circuit court was without jurisdiction because no bond for appeal from the order of the board of supervisors was executed, cannot be sustained.   No bond was necessary.   At common law, writs of error issued without bail or security, and so it has been held by this court as to writs of error where the statute providing for them does not require a bond.   *Swann* v. *Horne*, 54 Miss., 337; *Winters* v. *Claitor*, *Id.*, 341.   Appeals, both as to the right and the procedure, are statutory, and, unless the statute providing for and regulating an appeal requires a bond, none is necessary.   Pow. App. Proc., 104, 396; 1 Am. & Eng. Enc. Pl. & Prac., 965, and cases cited.   Section 79, code 1892, giving the right of appeal to the circuit court from the board of supervisors, and prescribing the manner of perfecting the appeal, makes no provision for a bond.   Other sections of the chapter regulating appeals to the circuit court and writs of *certiorari* to inferior tribunals expressly require a bond.   It may be that, since section 79 gives the right of appeal to any person aggrieved, and is available in favor of taxpayers who appeal merely to vindicate private rights, but in the interest of the public, and since the county as such cannot ordinarily suffer pecuniary loss or damage assessable on appeal against appel-

lants, the legislature deemed their liability for costs a sufficient protection against ill-advised or vexatious appeals.   Whatever may have been the reason, no bond is provided for by statute, and none was required.   In thus holding we are following the case of *Ferguson* v. *Board*, 71 Miss., 524, s. c. 14 South., 81; for, while the opinion in that case does not deal with the question, the absence of a similar bond was assigned for error, and the point, being jurisdictional, was necessarily passed upon, and held not well taken.   On the main question involved in this case, after careful reconsideration, we decline to disturb our former opinion.                                        *Affirmed.*